151 So.2d 236

**Troy VICKERS**

v.

**STATE.**

**1 Div. 915.**

Court of Appeals of Alabama.

March 12, 1963.

No attorney marked for appellant.

MacDonald Gallion, Atty. Gen., and Bernard F. Sykes, Asst. Atty. Gen., for the State.

JOHNSON, Judge.

Appellant, Troy Vickers, appeals from a conviction of grand larceny by the Circuit Court of Mobile County, Alabama. Representing himself, he was tried by a jury which returned a verdict of guilty. According to the record, the trial judge was obviously careful to protect the rights of the defendant during the trial.

The defendant's motion for a new trial was properly overruled. Under the first ground of the motion that the verdict was contrary to the great weight of the evidence, we have reviewed the evidence. Appellant concedes that he cut and carried away timber worth several hundred dollars from land which the State's evidence tended to show was owned by Robert L. Stringfellow and his wife, neither of whom, ac-

cording to Stringfellow, gave anyone permission to cut the timber. Both Vickers and Pelmon Smith testified that Vickers contracted with Smith to cut and transport the timber to S. M. Adams, Inc., and to sell it to the company in the name of J. R. Morris.

The State introduced into evidence six checks made to the order of J. R. Morris. The checks were issued by S. M. Adams, Inc., and drawn on its account in the Merchants National Bank of Mobile. It is undisputed that Vickers received the December 22, 1961, check for $175.00 from the company in the company's office, and two of the four subsequently dated checks, the last of which is January 15, 1962, and that he did not receive the October 6, 1961, check for $119.73.

C. E. Adams testified that Vickers told him that Morris owned the timber but at another time told him that he owned it himself but had it in Morris' name for tax purposes. Defendant denied these statements.

James R. Morris, a witness for the State, testified that he had lived in the vicinity of the alleged crime for 17 years but had recently moved. He said that he was the only Morris in the area with the initials "J. R." that he knew of. Defendant concedes that this James R. Morris is not the J. R. Morris with whom he dealt.

Vickers gave the following testimony in his own behalf:

"It was in December, I would say about the 15th or 20th, I don't know the direct date, but I was hunting some dogs of mine and one was missing, and I met a J. R. Morris near this R. L. Stringfellow's land. And we got to talking to one another and he said he wanted to sell his pulpwood off of— he had bought the land recently from R. L. Stringfellow and he wanted to sell the timber off of it. And we talked on and he said that somebody has estimated to give him six dollars a cord, and I said you ought to get

more than that. He asked me different people that bought it and I told him several names and he said if you can find out anybody, he went and showed me that same day the lines and everything, and he had a deed to J. R. Morris, and at that time he was in Mobile but he worked in New Orleans on some construction work is what he told me. And then he told me if I could get anybody to buy the land, if he would give seven dollars a cord at the end of —the cords was added up, that he would give me fifty cents on the cord. And—well, I called up Pelmon Smith, the colored fellow that testified, and he said he would meet me on Lott Road. I went out and showed him the timber and then J. R. Morris come out several times, the man that was going to sell the timber, and run the lines and everything and showed me, and to see Mr. Pelmon Smith, but Pelmon wouldn't be there, these other two colored fellows that worked for him would be in the woods, but Pelmon wouldn't be there. And that's all I know. And I picked up three checks at S. M. Adams for J. R. Morris and J. R. Morris was on the outside of the office and I walked out there and handed them to him. Mr. Adams did not ask me my name whatsoever. I told him J. R. Morris was the man that the timber was being sold, that as far as—I never did collect one penny of it. And the last, when I went back to check on—to get another—to pick up a check for J. R. Morris, Mr. Adams said there was something fishy. Well, it looked to me like—I figured there was something fishy on their side. Well, I even went to the bank. And then, when J. R. Morris come in out of New Orleans I told him about it and he was supposed to have checked on it and I told him that I was going to quit, I wasn't going to fool with it. It wasn't in my name and I didn't sign—this signature here that I looked at awhile ago is not my signature whatsoever. Not nary one of

them aint. They can check my signature. There's a lot of places here in Mobile that they can check mine. That's not my signature."

On cross-examination Vickers testified that J. R. Morris was a cripple who did an office job for construction work and that he had no written agreement with Morris. The solicitor asked Vickers the following question, "You don't know where he went or how to get in touch with him or anything?", to which Vickers replied, "No sir, I don't." The question of whether J. R. Morris, with whom appellant contends he negotiated, really exists or was a fictitious person was a question solely for the trial jury. We cannot say that the verdict should be disturbed as being contrary to the great weight of the evidence.

"When the presiding judge refuses to grant a new trial, the presumption in favor of the correctness of the verdict is thereby strengthened. * * *" Cobb v. Malone, 92 Ala. 630, 9 So. 738.

Affirmed.